William M. Audet (SBN 117456)
Ling Y. Kuang (SBN 296873)
Kurt D. Kessler (SBN 327334)
  waudet@audetlaw.com
  lkuang@audetlaw.com
  kkessler@audetlaw.com
**AUDET & PARTNERS, LLP**
  711 Van Ness, Suite 500
  San Francisco, CA 94102-3275
  Telephone: 415.568.2555

*Counsel for Plaintiffs and Proposed Classes*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741 |
| _____ | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224-VC | JURY DEMAND |

Plaintiffs, ROBERT RAMIREZ ("Plaintiff Ramirez") and DEXTER OWENS ("Plaintiff Owens), (together, "Plaintiffs") individually and on behalf of all others similarly situated, by and through undersigned class counsel, allege as follows as to Defendants Monsanto Company and Bayer Corporation (collectively "Monsanto" or "Defendants") based upon information and belief:

## I.      INTRODUCTION

1.       This proposed class action arises from the scientific evidence and additional evidence, including the proceedings in this Court, which have linked exposure to Defendants' Roundup® herbicide—including its active ingredient, glyphosate, alone and/or in combination with other Roundup® ingredients—to the disease non-Hodgkin's Lymphoma ("NHL").

2.       For decades, class members, including agricultural workers, landscapers and home gardeners have used Roundup®, unaware that this exposure was increasing their risk of contracting a dangerous ailment and a diagnosis of NHL.

3.       Defendants knew or should have known that Roundup® is carcinogenic and associated with an increased risk of developing NHL.

4.       Yet, Defendants failed to adequately inform and warn of the serious risks associated with the use of, and exposure to, glyphosate-based formulations and/or Roundup®.

5.       Instead, Defendants have made and continued to make representations suggesting that Roundup® was, and is, safer than ordinary household items.

6.       Upon information and belief, Defendants' representations were made with the intent of inducing the purchase and use of Roundup® for Defendants' pecuniary gain, and with disregard for and reckless indifference to the safety of those exposed to Roundup®/glyphosate.

7.       Many individual personal injury actions have been filed on behalf of those who know they have been exposed to and alleged they have been harmed by Roundup®. This class action picks up where those cases leave off.  Through it, Plaintiffs seek to represent those who have been exposed to Roundup® but have neither commenced a personal injury action nor hired

a lawyer to do so.

## II.    JURISDICTION

8.      This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a)(1) and (d), because the named Plaintiffs and many Class members are citizens of a different state than Defendants, there are more than 100 members of the Class, and the value of the relief sought exceeds $5,000,000.00, exclusive of interest and costs.

9.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because a substantial part of the events giving rise to the claims occurred in this District.  The Judicial Panel on Multidistrict Litigation already has transferred and consolidated in this District numerous other complaints alleging personal injuries related to Roundup®, and this Court is intimately familiar with the matter.

## III.    PARTIES & ROUNDUP

10.      Plaintiff ROBERT RAMIREZ is a natural person currently residing in Soledad, California.  Plaintiff Ramirez worked for Roto-Rooter in Salinas, California from 1999 to 2013, where he utilized a concentrated mix of Roundup® in the maintenance yard.  In 2018, Plaintiff Ramirez was diagnosed with Double Expressor Large B-Cell Non-Hodgkin's Lymphoma at the Salinas Valley Memorial Hospital in Salinas, and underwent chemotherapy treatment at Stanford University Hospital.  Plaintiff Ramirez was found to be in remission in 2018, but continued to require routine cancer screening.  Plaintiff Ramirez became aware that his injuries were caused by Roundup® within the applicable limitations period of filing his initial complaint.  Plaintiff Ramirez is a member of the proposed class, as defined herein.

11.      Plaintiff DEXTER OWENS is a natural person currently residing in Fresno, California.  Plaintiff Owens worked for the Fresno Unified School District in Fresno, California where he sprayed Roundup® around the school grounds.  In 2017, after a month of spraying, Plaintiff Owens developed a rash on his left hand.  Plaintiff Owens sought treatment and was

prescribed an ointment for the rash. Plaintiff Owens has not been diagnosed with NHL as of this filing, but he has an increased risk of future development of NHL due to his exposure to Roundup®. Plaintiff Owens is a member of the Medical Monitoring Class, as defined herein.

12.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation, with its headquarters and principal place of business in St. Louis, Missouri.  At all times relevant to this Complaint, Monsanto was the entity that discovered and promoted the herbicidal properties of glyphosate and is engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®. Monsanto advertises and sells goods, specifically Roundup®, in this District.  Monsanto transacted and conducted business within this District that relates to the allegations in this Complaint.

13.     At all times material, Bayer Corporation is an Indiana corporation with its headquarters and principal place of business in Whippany, New Jersey. On June 7, 2018, Bayer announced that it had successfully completed its acquisition of Monsanto. Consequently, Bayer is potentially liable for Monsanto's misconduct, depending on how the deal is structured and how it is being implemented (all of which is beyond Plaintiffs' knowledge). For purposes of this Complaint, Bayer Corporation and the Monsanto Company will be collectively referred to as "Monsanto" or "Defendants."

14.     "Roundup®" refers to all formulations of Defendants' Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak Herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k Herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready- to-Use Extended Control Weed &

Grass Killer 1 Plus Weed Preventer, Roundup® Ready- to-Use Weed & Grass Killer, Roundup® Ready- to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer 1 Ready-to- Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

15.     Defendants derived substantial revenue from goods and products used in this District and nationwide. Defendants expected or should have expected their acts to have consequences within this District, as well as nationwide, and derived substantial revenue from interstate commerce.  Upon information and belief, Defendants did design, sell, advertise, manufacture and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

## IV.     FACTUAL ALLEGATIONS

### A.     Background on Glyphosate-Based Formulations, Roundup® and Roundup Ready® Seeds

16.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

17.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

18.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

19.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

20.     Each year, approximately 250 million pounds of glyphosate-based products are

sprayed on crops, commercial nurseries, lawns, parks, and golf courses.  This usage has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the effects of glyphosate.

21.     At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or acquire responsibility for the commercial herbicide Roundup®, in which the active ingredient is glyphosate.

22.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate-based "Roundup®" as a broad-spectrum herbicide.

23.     The original Roundup®, containing a glyphosate-based formulation, was introduced in 1974.  Today, products incorporating glyphosate-based formulations are among the world's most widely used herbicides.

24.     Defendants are also intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup®, i.e., "Roundup Ready®." As of 2009, Defendant Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

25.     Monsanto (and subsequently Bayer) were able to secure their dominant market position in the glyphosate and herbicide market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of the Roundup® herbicide.

**B.     Evidence of Carcinogenicity in Roundup®**

26.     As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties, alone and/or in combination with other ingredients.

27.     By way of example only, studies and scientific statements reflecting the

carcinogenicity of glyphosate-based formulations include:

    a.   On March 4, 1985, researchers from the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

    b.   In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All the data required were submitted and reviewed and/or waived.

    c.   In October 1991, the EPA published a memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee, and one member refused to sign.

    d.   A 2006 study examining DNA damage in human subjects exposed to glyphosate produced evidence of chromosomal damage in blood cells. Subject blood cells showed significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

28.     Glyphosate and Roundup® have long been associated with carcinogenicity and the development of NHL.

29.     Numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®, including but not limited to:

    a.   In 1985, the EPA studied the effects of glyphosate in mice, finding a dose-related response in male mice linked to renal tubal adenomas, a rare tumor.

The study concluded the glyphosate was oncogenic.

b.   In 2003, scientists published the results of two case-controlled studies of pesticides as a risk factor for NHL and hairy cell leukemia. The studies concluded that glyphosate had the most significant relationship to NHL among all herbicides, with an increased odds ratio of 3:11.

c.   A 2003 study examined pesticides and herbicides as risk factors for NHL based on the pooled data of midwestern farmers. Even controlling for confounders, the study found a relationship between glyphosate and increased incidence of NHL.

d.   A 2008 population-based case-control study of exposure to various pesticides as a risk factor for NHL strengthened previous associations between glyphosate and NHL.

30.     In addition to evidencing the toxicity of the active molecule, many studies support the hypothesis that glyphosate-based formulations found in Defendants' Roundup® products are more dangerous and toxic than glyphosate alone.

31.     As early as 1991, evidence existed demonstrating that glyphosate-based formulations were significantly more toxic than glyphosate alone.

32.     A 2005 study showed that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone. This finding could be attributable to other chemicals in Roundup®, namely the surfactant polyoxyethylene amine ("POEA"), or alternatively, due to the possible synergy between glyphosate and Roundup® formulation products.

33.     A 2009 study examined the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells, and concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study confirmed that the adjuvants in Roundup® are not inert, and that Roundup® is always

more toxic than its active ingredient glyphosate acting alone.

34. The results of these studies were confirmed in recently published peer-reviewed studies and were always available and/or known to Defendants.

35. Defendants knew or should have known that Roundup® is more toxic than glyphosate alone, and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA, were necessary to protect Plaintiffs and members of the Class from Roundup®.

36. Defendants knew or should have known that tests limited to Roundup®'s active ingredient, glyphosate, were insufficient to prove the safety of Roundup®.

37. Defendants failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs and the Class from Roundup®.

38. Rather than performing appropriate tests, Defendants relied upon flawed industry supported studies.

39. Moreover, despite knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup® as safe.

**C.    IARC Classification of Glyphosate**

40. The World Health Organization ("WHO") of the United Nations International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency tasked with conducting and coordinating research into the causes of cancer.

41. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

42. IARC set glyphosate for review in 2015–2016. IARC uses five criteria for

determining priority in reviewing chemicals: the substance must have a potential for direct impact on public health; scientific literature must support suspicion of carcinogenicity; evidence of significant human exposure must exist; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern must be present; and related agents similar to one given high priority by the above considerations must exist. The IARC seeks to source the data it reviews from publicly accessible, peer-reviewed data.

43.     On March 24, 2015, after a year-long, cumulative review of human, animal, and DNA studies—many of which have been in Defendant Monsanto's possession since as early as 1985—the IARC's Working Group published its conclusion that the glyphosate contained in Roundup® herbicide is a Group 2A, "Probable Human Carcinogen," as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

44.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a Group 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

45.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL, as well as several subtypes of NHL, and found that the increased risk continued after adjustment for other pesticides.

46.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

### D.     Scientific Fraud Underlying the Safety Determinations of Roundup® and Glyphosate-Based Formulations

47.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure on the EPA to change its classification.

48.     This culminated in the EPA's reclassification of glyphosate to Group E, which was purportedly based upon evidence of non-carcinogenicity in humans.

49.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

50.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

51.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including eleven of the nineteen chronic toxicology studies needed to register Roundup® with the EPA.

52.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

53.     Three top executives of IBT were convicted of fraud for their role in the falsified studies in 1983.

54.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

55.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

56.     The investigation led to the indictments of the laboratory owner and a handful of employees.

**E.     Monsanto's False Representations Regarding the Safety of Roundup®**

57.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against

Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. The representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® include, but are not limited to:

a. "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences."

b. "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

c. "Roundup® biodegrades into naturally occurring elements."

d. "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

g. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

i. "Roundup® can be used where kids and pets will play and breaks down into

- 11 -

natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

58.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless, or free from risk;

    b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable;

    c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

    d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

    e.  its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

    f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

59.     Monsanto did not alter its advertising in the same manner in any state other than New York and, on information and belief, still has not done so.

60.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

61.     In spite of its knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements, and despite the evidence to the contrary.

62.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiffs and members of the Class to purchase and increase the use of Defendants' Roundup® for Defendants' pecuniary gain, and in fact did induce Plaintiffs and members of the Class to use Roundup®.

63.     Defendants made these statements with disregard for and reckless indifference to the safety of Plaintiffs and members of the Class.

64.     Notwithstanding Defendants' representations, certain scientific evidence has established a clear association between Roundup®—including glyphosate alone and/or in combination with other Roundup® ingredients—and genotoxicity, inflammation, and an increased risk of NHL.

65.     Defendants knew or should have known that Roundup®—including glyphosate alone and/or in combination with other Roundup® ingredients—is associated with an increased risk of developing NHL.

66.     Defendants misrepresented, omitted, and concealed material facts regarding, and failed to appropriately and adequately inform and warn Plaintiffs and members of the Class of information regarding, the serious risks associated with the use of and exposure to glyphosate-based formulations and/or Roundup®, including the risk of developing NHL, which reasonable persons would consider important in assessing such risks.

67.     Despite the IARC's classification of glyphosate as a Group 2A probable carcinogen, Defendants continue to maintain that glyphosate-based formulations and/or Roundup® are safe, non-carcinogenic, non-genotoxic, and falsely warrants to users and the general public that independent experts and regulatory agencies agree that there is no evidence of

carcinogenicity or genotoxicity in glyphosate or Roundup®.

68.     Defendants have claimed and continue to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic.

69.     Defendants claim on its website that "regulatory authorities around the world have comprehensively and routinely reviewed glyphosate and glyphosate-based herbicides for more than 40 years and their conclusions consistently support the safety of glyphosate and glyphosate-based herbicides when used as directed."

70.     However, glyphosate-based formulations and Defendants' Roundup® products have long been associated with serious side effects, and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

71.     Despite Defendants' knowledge that Roundup® was associated with an elevated risk of developing NHL, Defendants' promotional campaigns focused on Roundup®'s purported "safety profile."

72.     Defendants' statements proclaiming the safety of Roundup® and disregarding its dangers misled Plaintiffs and the Class.

73.     Defendants' failure to adequately warn resulted in (a) Plaintiffs and members of the Class using and being exposed to Roundup® instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (b) scientists and physicians failing to warn and instruct consumers about the risk of NHL associated with Roundup®.

74.     Defendants failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

75.     Defendants' failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

76.     Defendants' failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

77.     Defendants' failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

**F.      California Office of Environmental Health Hazard Assessment's Recent View of Glyphosate**

78.     Since July of 2017, the California Office of Environmental Health Hazard Assessment has listed glyphosate as a carcinogen.

79.     Glyphosate was added as an ingredient subject to California's Proposition 65, which requires businesses to warn customers about chemicals known to cause cancer.

80.     However, in August of 2019, the EPA told Defendants that the EPA would no longer approve labels abiding by California's requirements to warn customers that glyphosate in Monsanto's Roundup® has been linked to NHL.

**G.      The EPA's Position Contradicts Other More Credible Scientific Authority**

81.     As detailed above, the EPA's current position— "that there are no risks of concern to human health when glyphosate is used according to the label and that it is not a carcinogen"—is contradicted by numerous, credible public health authorities and scientists.

82.     One scholar has attempted to explain how the EPA and the IARC could have reached such diametrically opposed conclusions as to the genotoxicity of glyphosate-based herbicides, based upon the available data. He concluded that the agencies emphasized and relied more heavily upon very different types of data, noting that "[t]he IARC's evaluation relied heavily on studies capable of shedding light on the distribution of real-world exposures and genotoxicity risk in exposed human populations, while EPA's evaluation placed little or no weight on such evidence." [1]

83.     In a similar vein, as discussed above, concerns have been raised regarding the independence and integrity of the scientific and medical research and publication relating to

---

[1] Charles M. Benbrook, How Did the US EPA and the IARC Reach Diametrically Opposed Conclusions on the Genotoxicity of Glyphosate Herbicides?, Environ. Sci. Eur. 31:2, at 14 (2019).

Roundup®.

## V.    EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

84.     The running of any statute of limitations has been tolled by reason of Defendants'
fraudulent concealment. Defendants, through its affirmative misrepresentations and omissions,
actively concealed from Plaintiffs and Class members the true risks associated with Roundup®
and glyphosate.

85.     At all relevant times, Defendants have maintained that Roundup® is safe, non-
toxic, and non-carcinogenic.

86.     Indeed, even as of July 2016, Defendants continued to represent to the public that
"[r]egulatory authorities and independent experts around the world have reviewed numerous
long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that
glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based
herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis
added).

87.     As a result of Defendants' actions, Plaintiffs was unaware, and could not
reasonably know or have learned through reasonable diligence, that contact with Roundup®
and/or glyphosate exposed Plaintiffs to the risks alleged herein and that those risks were the
direct and proximate result of Defendants' acts and omissions.

88.     Because of their fraudulent concealment of the true character, quality, and nature
of Roundup®, Defendants are estopped from relying on any statute of limitations. Defendants
were under a duty to disclose the true character, quality, and nature of Roundup® because this
was non-public information over which Defendants had and continues to have exclusive control,
and because Defendants knew that this information was not available to Plaintiffs or to
distributors of Roundup®. In addition, Defendants are estopped from relying on any statute of
limitations because of its intentional concealment of these facts.

89.     Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing

alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Additionally, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## VI.     RELEVANT MDL COURT PROCEEDINGS

90.     On January 3, 2019, the MDL Court granted Monsanto's request in the bellwether Hardeman trial for bifurcation of causation from liability and damages.  See Pretrial Order No. 61 Re: Bifurcation, 3:16-md-02741-VC, Dkt. 2406 ("Monsanto's request to bifurcate the three bellwether trials, with the first phase to address causation only and the second phase to address all remaining liability and damage issues, is granted.")

91.     In this order, the Court remarked that if "Monsanto were also to lose on the causation question in a bifurcated trial in federal court, the parties would learn a great deal about Monsanto's chances of success (or lack thereof) in all future cases, however structured." Id.

92.     On March 12, 2019, Judge Chhabria issued the court's final jury instructions on the causation phase in an action entitled *Hardeman v. Monsanto*, 3:16-cv-00525-VC. See Pretrial Order No. 108: Final Phase 1 Instructions, 3:16-cv-00525-VC, Dkt. 191 ("If you conclude that Mr. Hardeman has proven that his exposure to Roundup was sufficient on its own to cause his NHL, then you must find for Mr. Hardeman.")

93.     On March 12, 2019, Judge Chhabria issued the Final Verdict Form for the causation phase of the Hardeman trial with just one question for the jury – "Did Mr. Hardeman

prove by a preponderance of the evidence that his exposure to Roundup was a substantial factor in causing his non-Hodgkin's lymphoma?" *Hardeman v. Monsanto*, 3:16-cv-00525-VC, Dkt. 192.

94.     On March 19, 2019, the jury in the Hardeman action found that Mr. Hardeman showed, by a preponderance of the evidence, that his exposure to Roundup® was a substantial factor in causing his non-Hodgkin's lymphoma. *Hardeman v. Monsanto*, 3:16-cv-00525-VC, Dkt. 227.

95.     On March 27, 2019, the jury in the Hardeman action, after phase 2 of the trial, found that Mr. Hardeman showed that Roundup's design was defective; that Roundup® lacked sufficient warnings of the risk of NHL; that Defendant Monsanto was negligent by not using reasonable care to warn about Roundup's NHL risk; that Mr. Hardeman was entitled to punitive damages; and awarded Mr. Hardeman nearly $90 million in damages. *Hardeman v. Monsanto*, 3:16-cv-00525-VC, Dkt. 288.

## VII.   CLASS ALLEGATIONS

96.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2) and/or (c)(4), on behalf of themselves and all others similarly situated as members of the below detailed Class(es). Each of the proposed Classes satisfy Rule 23(a):

97.     **Numerosity:** The classes are so numerous that joinder of all members is impracticable: The members of the Classes are so numerous as to render their individual joinder impracticable. Although the precise number of Class members is unknown, based upon information and belief, Plaintiffs allege that the Classes contain hundreds of thousands of class members.

98.     **Commonality:** There are questions of law or fact common to the class: Plaintiffs' claims raise significant common questions—that is, questions with answers not dependent upon the particular circumstances of class members, the answers to which are the same for everyone in

the Class, and that meet the requirements of Rule 23(a), including but necessarily limited to: whether Roundup® can cause NHL in humans (general causation), and whether Defendant misrepresented, omitted, concealed or failed to warn of or disclose material facts regarding the risks of use and/or application and/or exposure to Roundup. Common questions regarding Defendant's Roundup® products, its knowledge regarding their risks, and its conduct in marketing Roundup®—whether Defendant misrepresented, omitted, or concealed material facts regarding the Roundup® NHL risk—are inquiries salient to all claims. Resolving them on a class wide basis would itself significantly advance the resolution or determination of all Class members' claims and save millions of dollars for the Class members and thousands of hours of judicial time and resources.

99.    **Typicality:** The claims or defenses of the representative parties are typical of the claims or defenses of the class: Plaintiffs' claims are typical of those held by the other members of the Class in that each of them was exposed to Roundup®.

100.    **Adequacy:**  The representative parties will fairly and adequately protect the interests of the class. Plaintiffs and other class representatives will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel highly experienced in complex litigation, including complex class action litigation involving toxic exposures, and Plaintiffs intend to vigorously prosecute this action. Plaintiffs have no interests in this action that are adverse or antagonistic to the interests of the Class.

101.    **ISSUE-BASED CERTIFICATION UNDER RULE 23(C)(4):** Plaintiffs will seek to certify an issue class, defined as:

> All citizens of the United States that have been exposed to Roundup® and have been diagnosed with non-Hodgkin's Lymphoma ("NHL").

102.    Fed. R. Civ. P. 23(c)(4) allows "particular issues" to be "brought or maintained as a class action." Plaintiffs will seek "issue" based certification on the following issues/questions of law and fact:

a. Does exposure to Roundup® Products cause NHL?

b. Is exposure to Roundup® Products a substantial factor in causing NHL?

103. The resolution of these issues would materially advance this litigation, and any litigation involving Roundup® and its relation to NHL. Without certification, this issue would need to be litigated over and over in each and every separate lawsuit. A single proceeding here adjudicating these issues relating to causation would achieve economies of time and expense and promote uniformity of decisions for each member of this class.

104. It is permitted and oftentimes preferred for courts to certify "particular issues" using the procedures available under Rule 23(c)(4) to increase efficiencies where class members' injury-in-fact and individual damages must be adjudicated in separate proceedings. By certifying a class of one or more issues here, the Court can answer the liability question to allow personal injury cases to go forward and would be most efficient and materially advance the litigation because subsequent courts would be spared from having to adjudicate the common issues anew in each case.

105. In addition, or as an alternative, declaratory relief under Rule 23(b)(1) is appropriate as Monsanto sold Roundup® and failed to disclose the nature, extent, and severity of the alleged adverse effects of Roundup® and/or glyphosate across the country. Rule 23(b)(1) permits class certification where prosecution of separate actions by individual putative class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Certification is appropriate when the class seeks injunctive or declaratory relief to change an alleged ongoing course of conduct that is either legal or illegal as to all members of the class. Plaintiffs and the proposed Classes satisfy this standard. If each of the thousands of putative class members brought separate suits making the allegations made in this complaint, the adjudication of these actions would risk creating inconsistent decisions that would establish varying standards to which Defendants would have to adhere. Plaintiffs therefore seek declaratory and injunctive

relief that is applicable to all class members, and certification pursuant to Rule 23(b)(1) is therefore appropriate.

106.     In addition, or as an alternative, declaratory relief under Rule 23(b)(2) permits class certification where the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Monsanto knew or should have known that exposure to Roundup® caused or was a substantial factor in the development of NHL – and should have disclosed that to consumers and users across the United States. Defendants have acted on grounds that apply generally to the class, such that declaratory relief is appropriate on the issue of causation. Prosecuting separate actions as to this declaratory relief by individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class in regards to the nature of the relationship between Roundup® and NHL. Plaintiffs therefore seek a declaration that Roundup® is a substantial factor in causing NHL for purposes of any legal proceedings against Defendants.

107.     **MEDICAL MONITORING CLASS:** Alternatively, and/or in addition to the above, Plaintiffs seek to certify a California Medical Monitoring class, defined as:

> All citizens of California who have been exposed to Roundup® and have not been diagnosed with non-Hodgkin's Lymphoma ("NHL").

108.     The need for medical monitoring is a consequence of the Medical Monitoring Class's exposure to Roundup® and such need for medical monitoring is consistent with applicable sound medical science. Plaintiff Owens and the Medical Monitoring Class, having been exposed to Roundup®, retain a significantly increased likelihood of developing NHL when compared to potential development of NHL for those who had no similar exposure. As a result, and due to NHL's debilitating health impact and nature of related treatment, monitoring and the early detection of an NHL diagnosis will greatly improve lifespan, health, and the well-being of those members in the Medical Monitoring Class.

109.     As a result of Monsanto's failure to disclose the true potential harm of the Roundup® and/or glyphosate, Plaintiff Owens and members of the Medical Monitoring Class have in the past and continue to be significantly exposed to Roundup® and thus have a much higher likelihood of developing NHL.

110.     As a proximate result of Monsanto's conduct, Plaintiff Owens and the Medical Monitoring Class have in the past been and are presently at an increased risk of NHL, requiring them to incur, both presently and in the future, costs and medically necessary diagnostic testing for the detection and/or treatment of NHL.

111.     Plaintiff Owens  and members of the Medical Monitoring Class have presently suffered injury proximately caused by Monsanto's tortious conduct. Plaintiff Owens and members of the Medical Monitoring Class have a legally protected interest in not being exposed to carcinogenic materials, such as those found in Roundup®, and at levels that can result in a significantly increased risk of developing NHL. Plaintiff Owens and the Medical Monitoring Class also have a legally protected interest in avoiding the present and future need for expensive diagnostic testing and/or treatment costs. Plaintiff Owens and the Medical Monitoring Class would not have the present and future need to incur the cost of testing and/or treatment to determine the presence of NHL but for the past and ongoing exposure they have suffered through the tortious conduct of Monsanto.

112.     The following Persons are further excluded from the classes

a.     Judicial officers and associated court staff assigned to this case and their immediate family members;

b.     Past and present officers, directors, and employees to the Defendant or any of its direct or indirect subsidiaries; and

c.     All those otherwise in the Class who timely and properly exclude themselves therefrom in such manner as the Court may direct.

113.     Notice – any notices directed by the Court shall comply with all provisions of

Rule 23 and applicable court rulings regarding notice(s). Class and Subclass members may be notified of the pendency, certification and/or other important steps in this action under Fed. R. Civ. P. 23, as appropriate, through a Court-approved combination of direct and indirect methods, including print, broadcast, social media, posting, and other physical and electronic means.

## VIII.   CAUSES OF ACTION

## COUNT I

### Strict Liability—Design Defect

114.     Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

115.     Plaintiffs and the Class bring this strict liability claim against Defendants for defective design.

116.     At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs and the Class, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that the Class was exposed to.

117.     At all times relevant to this litigation, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs and the Class.

118.     At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these

products throughout the United States, including Plaintiffs, without the substantial change in the condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

119.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

120.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

121.    At all times relevant to this action, Defendants knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

122.    Therefore, at all times relevant to this litigation, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

123.    When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

124.    When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of NHL when used in a reasonably anticipated manner.

125.    When placed in the stream of commerce, Defendant's Roundup® products

contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

126.     Defendants did not sufficiently test, investigate, or study their Roundup® products and, specifically, the active ingredient glyphosate alone and/or in combination with other Roundup® ingredients.

127.     Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

128.     Defendants knew or should have known at the time of marketing their Roundup® products that exposure to Roundup® could cause NHL.

129.     Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

130.     Defendants could have employed safer alternative designs and formulations.

131.     Plaintiffs and the Class were exposed to Defendants' Roundup® products without knowledge of their dangerous characteristics.

132.     At all times relevant to this litigation, Plaintiffs and the Class were exposed to Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

133.     Plaintiffs and the Class could not have reasonably discovered the defects and risks associated with Roundup® before or at the time of exposure.

134.     The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed Roundup® products to make them less dangerous. Indeed, at the time that Defendants designed Roundup® the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

135.     At the time Roundup® products left Defendants' control, there was a practical,

technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

136.     Therefore, as a result of the unreasonably dangerous condition of Roundup® products, Defendants are strictly liable to Plaintiffs and the Class.

137.     The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiffs and the Class NHL, and, but for Defendants' misconduct and omissions, Plaintiffs and the Class would not have sustained their injuries.

138.     As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiffs and the Class have suffered and will continue to suffer damages, injury in fact, and/or ascertainable loss in amounts to be determined. Plaintiffs and the Class therefore seek declaratory, injunctive, and equitable relief, as well as all relief available under law and equity.

139.     Additionally, Defendants' conduct, as described above, was oppressive, fraudulent, malicious, and conducted with willful and conscious disregard for the health and safety of users of the Roundup® products, including the Plaintiffs and the Class herein. Defendants had knowledge of the safety problems associated with Roundup®, and suppressed this knowledge from the general public. Defendants also made conscious decisions not to modify or alter the Roundup® products. Defendants' conduct warrants an award of punitive damages.

140.     The determination of common questions on a class-wide basis will advance the resolution of this claim for individual Class Members.

## COUNT II

## Strict Liability—Failure to Warn

141.     Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

142.     Plaintiffs and the Class bring this strict liability claim against Defendants for failure to warn.

143.     At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

144.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs and the Class, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup®.

145.     At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn the Plaintiffs and the Class of the dangers associated with Roundup® use and exposure. Defendants, as manufacturers, sellers, or distributors of chemical herbicides, are held to the knowledge of experts in the field.

146.     At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

147.     At all times relevant to this litigation, Defendants failed to investigate, study, test,

or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Plaintiffs and the Class.

148.     Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of Roundup® products and the carcinogenic characteristics of glyphosate when used with the other chemicals in Roundup®, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiffs and the Class.

149.     Defendants knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to Roundup® products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup®, and further made false and/or misleading statements concerning the safety of Roundup®.

150.     At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs and the Class, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendants.

151.     At all times relevant to this litigation, Plaintiffs and the Class were exposed to the use of Defendants' Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

152.     Plaintiffs and the Class could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the exposure of Plaintiffs and the Class. Plaintiffs and the Class relied upon the skill, superior

knowledge, and judgment of Defendants.

153.     Defendants knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

154.     The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiffs and the Class to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

155.     To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiffs' and the Class's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable human carcinogen.

156.     As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were sold or distributed by Defendants, were applied by Defendants, and when Plaintiffs and the Class used or became exposed to them.

157.     Defendants are liable to Plaintiffs and the Class for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant

information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

158.     The defects in these Roundup® products were substantial and contributing factors in causing Plaintiffs' and the Class's injuries, and, but for Defendants' misconduct and omissions, Plaintiffs and the Class would not have sustained their injuries.

159.     Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiffs and the Class could have avoided the risk of developing injuries as alleged herein and Class members and/or the individuals or entities that employed Class members could have obtained alternative herbicides.

160.     As a direct and proximate result of Defendants' placing defective Roundup® products into the stream of commerce and exposing Plaintiffs and the Class to them, these Class members have suffered and will continue to suffer damages, injury in fact and/or ascertainable loss in an amount to be determined. Plaintiffs therefore seeks declaratory, injunctive, and equitable relief, as well as all relief available under law and equity.

161.     Additionally, Defendants' conduct, as described above, was oppressive, fraudulent, malicious, and conducted with willful and conscious disregard for the health and safety of users of the Roundup® products, including the Plaintiffs and the Class herein. Defendants had knowledge of the safety problems associated with Roundup®, and made conscious decisions not to warn or inform the public of the risks of Roundup® products. Defendants' conduct warrants an award of punitive damages.

162.     The determination of common questions on a class-wide basis will advance the resolution of this claim for individual Class Members.

## COUNT III

## Negligence/Negligent Misrepresentation

163.     Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

164.     Defendants owed Plaintiffs and Class members a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup®, including a duty to assure that the product would not cause users an increased risk of suffering unreasonable, dangerous side effects.

165.     Defendants breached that duty. Defendants manufactured, marketed, advertised, and/or sold, Roundup® as a 'weed killer.' However, Defendants failed to disclose to consumers material information regarding the link between exposure to relevant doses and the likelihood of NHL after minimal usages and exposure per year, despite the fact that Defendants knew or should have known about Roundup's propensity to cause NHL.

166.     Defendants also failed to disclose, concealed, suppressed, and omitted material information concerning Roundup® and the truth regarding the various studies that Roundup® would cite to support their false claim that Roundup® did not cause NHL.

167.     Defendants intended that Plaintiffs and the Class rely upon their material misrepresentations and omissions.

168.     Defendants' negligent conduct, as alleged in this complaint, exposed Plaintiffs to an increased risk of NHL from Roundup, rendering Defendants responsible for preventing or mitigating that risk of harm through payment for a program providing medical diagnosis or other programmatic remedies, according to proof and as approved by the Court.

169.     Defendants' breach proximately caused Plaintiffs and the Class to suffer damages, injury in fact and/or ascertainable loss in amounts to be determined.

170.     The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class Members.

## **COUNT IV**

**Claim For Declaratory Relief**

171.     Plaintiffs repeat and reallege the foregoing allegations on behalf of themselves and the Class as if fully set forth herein. This claim serves as an independent claim for relief or, alternatively, as further explanation of the declaratory relief sought under the other claims pled herein.

172.     Defendants have acted and refused to act with respect to its misrepresentations and omissions concerning the safety of Roundup® in a manner that has affected all Class members, and the declaratory, injunctive and equitable relief sought herein under Fed. R. Civ. P. 23(b)(2), and/or 23(c)(4) will provide relief to all members of the Class.

173.     An actual case and controversy exists as between Plaintiffs and Defendants as to:

    a.   Whether there is a substantial link between Roundup® and non-Hodgkin's Lymphoma

174.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." The declaratory relief sought here does not fall within any of the exemptions set forth under the Act.

175.     The requested declaratory relief set forth herein will produce answers to the common questions that will resolve a controversy that lies at the heart of this litigation and will allow Plaintiffs and the Class to obtain relief that directly redresses the injuries suffered.

**COUNT V**

**Claim for Medical Monitoring Program
(On Behalf of the Medical Monitoring Class)**

176.     Plaintiff Owens and the Medical Monitoring Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

177.     Medical monitoring in this action is linked directly to Counts 1 through 3 herein –

that Defendants' failure to warn and misrepresentations led to exposure to Roundup.

178.     Medical monitoring costs are necessary and reasonable to detect any onset of non-Hodgkin's Lymphoma.

179.     The Medical Monitoring Class members have all experienced significant direct exposure to Roundup® through its application and through its normal use and function.

180.     As alleged, Roundup® and the glyphosate found within it possess carcinogenic policies and are thus highly toxic.

181.     Defendants' conduct, as alleged herein, placed Plaintiff Owens and the Medical Monitoring Class at increased risk of contracting NHL, through exposure to Roundup®. The Medical Monitoring Class possesses a significantly higher chance of developing NHL compared to the chances the public at large without exposure to Roundup®.

182.     NHL is a type of cancer that is an incredibly serious disease with a significant risk of death.

183.     There is a significant medical benefit in terms of increasing the likelihood of positive outcomes as a result of early detection and diagnosis of NHL, which can be accomplished via medical monitoring.

184.     Medical monitoring costs are necessary and reasonable to detect any onset of NHL.

185.     NHL, as alleged, is related specifically and tangibly to exposure to Roundup, and thus a direct and proximate result of exposure to Roundup.

186.     Under principles of common law tort and as a matter of equity, Defendants should pay for the costs of medical screening, diagnostic and/or surveillance programs and services to be provided to Plaintiff Owens and the Medical Monitoring Class, to prevent or mitigate the injury otherwise resulting from Roundup® exposure, as appropriate and according to proof, through an appropriate program approved by the Court and administered under its ongoing supervision.

187.     The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class Members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, requests the Court to enter judgment against the Defendants, as follows:

i.      An order certifying appropriate Class(es) pursuant to Fed. R. Civ. P. 23(a)(1)-(4), 23(b)(1), 23(b)(2), and/or 23(c)(4) for the determination of common questions of law and fact regarding Defendants' product, knowledge, conduct, and duty, and to provide programmatic relief as alleged and requested herein; and designating Plaintiffs and their undersigned counsel as Class Representatives and counsel as appropriate;

ii.     Compensatory damages, and/or, exemplary, punitive, and statutory penalties and damages as allowed by law;

iii.    Compensatory, exemplary and punitive damages, statutory penalties, and other monetary relief, including interest, as allowed by law, in amounts to be proven, for Plaintiffs and the Classes;

iv.     A program of court supervised relief in the form of medical monitoring for the Medical Monitoring Class;

v.      An order collaterally estopping Monsanto from claiming no link between Roundup® and NHL;

vi.     Appropriate declaratory, equitable, medical monitoring, and/ or injunctive relief according to proof;

vii.    An award of reasonable attorneys' fees and costs incurred in this action; and

viii.   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all matters so properly triable.

Dated: November 30, 2021                 Respectfully Submitted,


                                         *s/ William M. Audet*
                                         William M. Audet (SBN 117456)
                                         Michael McShane (SBN 127944)
                                         Mark E. Burton (SBN 178400)
                                         Ling Y. Kuang (SBN 296873)
                                         Kurt D. Kessler (SBN 327334)
                                         **AUDET & PARTNERS, LLP**
                                         711 Van Ness, Suite 500
                                         San Francisco, CA 94102-3229
                                         Telephone: 415.568.2555
                                         waudet@audetlaw.com
                                         mmcshane@audetlaw.com
                                         mburton@audetlaw.com
                                         lkuang@audetlaw.com
                                         kkessler@audetlaw.com